IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF RIHANNA R. ET AL.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF RIHANNA R. ET AL.,
CHILDREN UNDER 18 YEARS OF AGE.


STATE OF NEBRASKA, APPELLEE,

v.

JESUS M., APPELLANT.


Filed July 9, 2019.    Nos. A-18-1092 through A-18-1094.


Appeals from the County Court for Adams County: MICHAEL P. BURNS, Judge. Affirmed.

Sam Zeleski, Assistant Adams County Public Defender, for appellant.

Cassie L. Baldwin, Deputy Adams County Attorney, for appellee.


MOORE, Chief Judge, and PIRTLE and BISHOP, Judges.

BISHOP, Judge.

Jesus M. appeals the separate orders of the county court for Adams County, sitting as a juvenile court, which terminated his parental rights to his three children: Rihanna R. (case No. A-18-1092), Alexander R. (case No. A-18-1093), and Jose R. (case No. A-18-1094). We consolidate these three appeals for disposition, and we affirm the orders of the juvenile court.

BACKGROUND

PROCEDURAL BACKGROUND

Jesus is the biological father of Rihanna (born 2009), Alexander (born 2012), and Jose (born 2008). Sarah R. is the children's biological mother. The State sought to terminate Sarah's parental rights to the three children during the juvenile proceedings below, however, the record

- 1 -

indicates that Sarah ultimately relinquished her parental rights to the children. Because Sarah is not part of this appeal, she will only be discussed as necessary.

Rihanna, Alexander, and Jose were removed from their parental home on December 22, 2016, because there were allegations that Jesus sexually abused two of Sarah's older children. Rihanna, Alexander, and Jose have remained out-of-home ever since.

The transcripts indicate that the children were adjudicated under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016); however, the adjudication orders do not appear in our record. The State alleged the adjudications occurred "on or about June 16, 2017."

The State filed three separately docketed juvenile cases, one for each child. The first pleadings that appear in our record are the State's "Supplemental Petition[s]," filed on May 8, 2018, seeking to terminate Jesus' parental rights to Rihanna, Alexander, and Jose pursuant to Neb. Rev. Stat. § 43-292(2), (7), and (9) (Reissue 2016). The State alleged that: Jesus substantially and continuously or repeatedly neglected and refused to give the children necessary care and protection; the children had been in an out-of-home placement for 15 or more of the most recent 22 months; Jesus had subjected the children or another minor child to aggravated circumstances, including, but not limited to, abandonment, torture, chronic abuse, or sexual abuse; and termination was in the children's best interests.

TERMINATION HEARING

The hearing on the supplemental petitions to terminate Jesus' parental rights was held on August 23, 2018. An interpreter was present to assist Jesus. The juvenile court stated that "[a]ll three cases [were] going to proceed in consolidated fashion for purposes of evidence presented on the . . . pending supplemental petitions to terminate parental rights." Four witnesses--all called on behalf of the State--testified. A summary of the relevant evidence follows.

Aimee Ostdiek is a children and family services specialist with the Nebraska Department of Health and Human Services (DHHS). She testified that the children were removed from their home on December 22, 2016, and they have remained in an out-of-home placement since that time; the children were placed with their maternal aunt and her husband. The children were removed from the parental home because there were allegations that Jesus sexually abused two of Sarah's older children. Ostdiek has been the caseworker for Rihanna, Alexander, and Jose since January 6, 2017. Ostdiek stated that during the pendency of the case, DHHS has provided parenting time/supervised visitation, family support, and therapeutic services. When Ostdiek was assigned to the case on January 6, the children were having visits with their mother, "however, there was a no-contact order in place with their father." She said that Jesus did participate in supervised visits with the children once the no-contact order was lifted on January 12. Supervised visits stopped in May after Ostdiek received recommendations from Sandra Hale Kroeker (who completed trauma assessments on the children) that contact be limited to therapeutic interaction. Jesus has not had any contact with the children outside of a therapeutic setting since May 2017. Ostdiek testified that Jesus was incarcerated on June 2, 2017, and he remained incarcerated at the time of the termination hearing; she believed his scheduled trial date was for some time in September 2018, but she was not certain (our record does not indicate what criminal charges had been filed against Jesus). She stated that "there's no knowing what is going to happen as far as [Jesus] is concerned," and permanency is important for the children.

On cross-examination, Ostdiek acknowledged that in her contact with Jesus (she met with him monthly, for the most part) he asked about the children and inquired as to their academic progress. She also acknowledged that Jesus asked for more direct contact with the children. Jesus was able to make arrangements to provide winter boots for the children, and he also provided them with bicycles, birthday gifts, and Christmas gifts.

Sandra Hale Kroeker (Sandra) is a self-employed licensed clinical social worker. She is also a "licensed mental health practitioner, a licensed marriage and family therapist, and an . . . independent mental health practitioner." She testified she received a certification in July 2017 as a clinically certified sex offender treatment specialist. Additionally, she has specialized training in "sexual abuse, victimization" as well as "separation and trauma loss, separation anxiety, child detachment, and critical incident."

Sandra completed trauma assessments for Rihanna, Alexander, and Jose. For the assessments, she met with them for several sessions from March to May 2017; these included six individual sessions, two individual trauma therapy sessions, and two family sessions (one with the foster parents and one with their biological mother). Sandra completed her report (exhibit 21) on May 19. Her report indicates that she had "collateral consultation" with the foster parents, Ostdiek, and Jessica Kroeker (the children's trauma therapist). Among the information also reviewed by Sandra was a "Child Progress Report" from February, a "Psychological Report" from February, "Contact Guidelines and Recommendations," "Foster Parent Journal," "PathFinders Support Services Inc. supervised visitation reports" from January to May, and Individual Education Plans for Rihanna and Jose. None of these documents are contained in our record.

The report states that Jose has been "spanked" by Jesus for soiling his pants, not eating, and not doing what he was told; the spankings were both by hand and by belt. The report also notes inappropriate sexual contact between the mother and one of the children. Sometimes the children slept in the same bed as their parents; the children reported that their mother did not wear a shirt to bed (her breasts were exposed), and that sometimes Jesus did not wear anything to bed (his penis was exposed).

Sandra noted the foster parents reported that during telephone or skyping visits with Jesus and Sarah, the children "appear to become emotionally and behaviorally out of control," "[t]hey have expressed not wanting to talk to the birth parents, or only talk for short periods," and the children "leave the room or refuse to talk or to comply with their redirects, become physically aggressive, oppositional, running out of the room." Sandra reported that the foster parents also noted "that at the start of the telephone visitation, [Jesus] tended to promise to get the children extravagant gifts, like child sized motorized vehicles." Following the telephone and Skype calls, "the children's overall emotional presentation is 'hyper' and 'demanding,'" "[t]hey are more easily upset [and] argumentative with each sibling," and they "appear to regress to infantile mannerisms." "The foster parents appear to struggle with the constant disruption and the emotional, physical and academic problems that persist following each parental contact." "The in-home visitation journal reports and the supervised Skype reports of Pathfinders further underscore the severity and chronic nature of [the children's] inability to cope with the parental contact as a sibling group."

Sandra's report stated, "The children do not appear to be able to tolerate the triggers, emotional stimulation, or contact with their parents by the telephone, or by Skype." "The information reviewed indicates that the parents appear to have limited to no insight into the impact

the family crisis, separation trauma, and past trauma has on each child. The parents project blame, ignore boundaries, and demonstrate no child awareness." The report states,

> Based on the information reviewed and tests administered, [the children] appear to have been exposed to traumatic events and environments that have caused severe emotional trauma that have negatively impacted them developmentally, emotionally, and socially, and academically. The primary trigger to the severe emotional dysregulation and maladaptive coping behaviors appears to be contact with their birth parents. There is information to suggest physical abuse, neglect, and exposure to a sexualized environment, and sexual abuse.

Sandra testified that at that time of her assessment, all three children had developmental delays. Rihanna (age 7 at the time) had some identifiable delays in terms of academic performance. Alexander (age 5 at the time) was "very emotionally delayed"; "[h]e was a preschooler and engaged in more infantile, very aggressive behaviors, not able to regulate, completely deregulated." Jose (age 8 at the time) "appeared to experience the most significant developmental delays." He was totally nonverbal and was nonresponsive to directions. He had an "IEP" from the school that "identified significant developmental and academic delays in speech and language and gross motor function and small motor function and academic ability."

At the time of her assessment, the children were having visitation with their biological parents at a neutral location, and it was Sandra's recommendation that visits cease. She said,

> It became apparent to me that the visitation was very traumatic for the children, that their behaviors were so escalated that it created an unsafe environment for each of the children, for the people who were attempting to supervise the visitation, as well as for the foster parents, as well as for all of the other care providers. The children were completely unmanageable and hysterical.

When asked if it was fair to say that contact with the parents appeared to be a significant emotional trigger for each of the children, Sandra responded, "Yes." The children "were in a constant state of trauma." "[W]e stair-stepped the contact with the parents to doing telephone and Skyping. And our observation was that through the continued contact that behaviors escalated, continued to escalate." "There was significant evidence that the children were in that chronic state of trauma, what we call complex trauma, and were unable to function in any arena, day care, school, [or] home. And so we recommended that that contact be stopped." Sandra then recommended therapeutic contact with the mother, "the parent we had access to at the time." Jesus "was not available to us," "[h]e was incarcerated"; "[w]e did identify that letter writing, as long as it followed certain parameters, would be appropriate at that time." She said:

> [T]he information was to be very casual, current information, not to elicit strong emotional responses, saying how much I miss you and love you, to not have religious overtones, but to ask questions about the kids' current activity, what they are doing, the highs and lows of the day or of their week, giving them basic news information . . . about themselves in the letter, asking questions primarily to pursue them, . . . taking about story books or songs with the children, things that would engage them.

It was Sandra's understanding that DHHS conveyed those parameters to Jesus. On cross-examination she said the caseworker, Ostdiek, indicated that that did occur. And Ostdiek testified that she did convey that information to Jesus; she also confirmed that an interpreter was present during that conversation, and that Jesus indicated that he understood the parameters that were conveyed to him.

Sandra acknowledged that Jesus did engage in letter writing to the children (one letter a month and then also if there was a birthday) and that she reviewed the letters prior to disclosing the contents to the children. According to Sandra, Jesus was not compliant with the parameters set out for the content of the letters. She said, "They were emotionally laden. I miss you, your mom and I love you, asking them to remember him. They had strong religious overtones towards the latter part of this period. He did cartoons, drew cartoons for the kids, [and] made birthday cards for them." "So the parts of the letters that were helpful to the children we read to them," but there were certain portions that were not conveyed to the children. The children's reactions to the letters "have been mixed." "Initially they were frozen, nonresponsive." "They had a better response to the cartoon characters, to the images that were drawn," "[t]hey could relate to those." "[A]s it progressed, Alexander and Jose refused to look at the letters or talk about them. They have not participated in that part. Alexander's behavior becomes hyperactive. He becomes very aggressive. Jose freezes and is mute. He will not respond at all." When asked if it is a fair assessment to say that Jesus is a trigger for the trauma that the children have experienced, Sandra responded, "Yes," and she agreed that they continue to have him as a trigger.

Sandra continued to provide ongoing therapy with all three children and was still working with them at the time of the termination hearing. Sandra provides family therapy once a month and works with the foster parents "in terms of being a healing family, providing the psycho-education." A different person (Jessica Kroeker) provided the trauma therapy. Over the course of Sandra's treatment with the children, she had seen their behaviors decrease; she attributed that to "[t]he stability of their environment, their response to the therapeutic interventions in the home as well as the therapeutic interventions that they have worked with to address the trauma." When asked if she could foresee any detriment to the children being removed from their foster parents, Sandra responded, "Yes." She explained that the children have identified their foster parents as their primary caretakers and "have established a significant bond and perceive them to be the safe people in their life. They are able to identify a schedule and routine." Sandra stated,

> [I]f you take a child who has suffered complex trauma and you put onto them another trauma, a separation trauma and another loss, that results in irreversible psychological, emotional, and developmental damage, causes the children to become stuck at the developmental state that they are currently at and creates additional emotional trauma and survival patterns of behavior that become very difficult for them to function within any arena. They can't learn. They don't participate socially in an appropriate way.

Sandra testified that Jesus was not incarcerated the entire time that she had been providing therapeutic intervention. "[T]here was a very short period where he was having visitation and then was incarcerated, and we had no access." To Sandra's knowledge, Jesus was still incarcerated at the time of the termination hearing. Sandra was asked, if Jesus was available for therapeutic visitation with the children, would that be recommended at this time? Sandra responded, "No."

She said that "[b]ecause of the allegations at the time of placement and the reports of the children during their treatment," she would want to have psychological and risk assessments completed on Jesus prior to any therapeutic intervention. "When you have children with complex trauma you have to be extremely thoughtful about how you proceed in these cases so that you don't further traumatize the children." "They are still addressing the issues with their mother, and it's important for the parent to be able to empathize and acknowledge the trauma that the children have been through," "[s]o he would need to go through some work first . . . before we would start . . . the therapeutic interventions." When asked if she thought contact with Jesus would be detrimental to the children at this time, Sandra responded, "Yes." When asked how important permanency is to these three children, Sandra responded, "It's critically important to their emotional, psychological, and overall development to have permanency, to have a safe place that has predictability that . . . can provide for all of their needs in a safe manner."

On cross-examination, Sandra acknowledged that she had never met Jesus. She also acknowledged that the largest part of the contact that the children had with their parent during therapy was with their mother, and that the children's reactions during therapy were largely a result of the visits with their mother. But Sandra also stated that in the early visitations, "both parents were present . . . for the visitations[,] [a]nd so . . . [the children's] behavior was -- the observed behavior was in conjunction with the visitation with both parents." The children also reacted to their father's letters.

Jessica Kroeker (Jessica) is a provisionally licensed mental health therapist. She works for Sandra's therapy practice and also works at Project Harmony, the Child Advocacy Center, in Omaha, Nebraska. Jessica testified that she has been trained in "evidence-based practice, including trauma-focused cognitive behavioral therapy and cognitive behavioral interventions for trauma in schools." Jessica has provided ongoing therapy for Rihanna, Alexander, and Jose since March 2017. She did six individual therapy sessions with each of the children. She was also responsible for doing their trauma therapy, "focusing on their past traumatic experiences with their mother," and so they did "family therapy to work on the past trauma and separation." When asked if she was able to identify any triggers of trauma for each of the children, Jessica, responded, "Yes," "when they would come to the therapy, the interactions with the parents, contact with mom would trigger their anxiety . . . for instance, Jose would become, essentially, mute and wouldn't be able to talk or disclose[,] Alexander would become aggressive, and Rihanna would withdraw and hide under tables." Jessica was present on one or two occasions in the beginning of 2018 when Jesus' letters were read to the children. During the reading of those letters, the children "were rather despondent" or "they would be more interested in other activities," but they did not demonstrate any negative behaviors; "it was . . . in an environment where we had a lot of emotion regulation opportunities, so we were able to manage that piece of it and kept . . . that . . . portion of the therapy session brief to help manage those emotions."

Jessica is implementing coping strategies with the children. They "talk about things towards deep breathing and emotion regulation through expressing emotions, assertive communication, expressing and identifying emotions in a wide variety of environments." They also work on "self-coping strategies like snuggling with a stuffed animal or a blanket, talking to an adult, a safe adult . . ., taking a drink of water, and other types of grounding opportunities or grounding activities where they can be present in the current moment." Throughout the course of

treatment, the children have established more coping strategies, have shown that with structure and routine they can be involved in pro-social activities, and have improved in their social skills. Jessica attributes this progress to "[b]eing in an emotionally safe environment" from having a structure and routine, having opportunities to learn social skills, and having supportive adults. Structure and routine is important to these children. Changing the structure and routine they are used to would "impact their sense of security and safety and trust and attachment"; "breaking that structure, routine, and attachment would cause long-term psychological ramifications." Maintaining the children's current placement is in the children's best interests "[a]t this time." Jesus has not participated in any of Jessica's therapy sessions with the children. She has not been able to work with him at all with regard to coping strategies for the children. Contact with the children, beyond letter writing, would not be in the children's best interest at this time because previously the children's behaviors were unsafe when there was visitation and contact, "so until risk assessments can be conducted and until there can be boundaries that are followed through on and it's determined to be safe for the children, then contact beyond [letters] would not be recommended." On cross-examination, Jessica acknowledged that she had never seen Jesus interact with his children. According to Jessica, permanency is "very important" for these children.

The children's maternal aunt testified that the children were placed in her home on December 22, 2016, and have remained in her home ever since. She said that Jose has an "IEP in school" and he "goes to OT and speech therapy," he also previously had physical therapy for 6 to 8 months; Jesus has not participated in any of those appointments. When Jose first came to live with her, "pretty much every time he would go to visitation he'd come back, either he had had an accident there [soiled his pants] or he would have an accident when he came home or he would wet the bed." The aunt has noticed an improvement, but said Jose sometimes still wets or soils his pants when something new is introduced. Jose has improved since he has been at his aunt's home: "He is speaking a lot more. . . . His schoolwork has improved tenfold," he is also participating in extracurricular activities. When Rihanna first came to live with her aunt, Rihanna would "hide under furniture and growl like an -- [a] wild animal"; "that's the way she would react to stressful situations." Rihanna's behaviors did not last long. Alexander "has a lot of anger inside that we kind of are working with." The children's aunt said she tries to keep the days pretty structured and the children know their routine. Overall they are doing "very good" in her home.

At the conclusion of the hearing, the parties orally stipulated that Jesus was arrested on June 2, 2017, and has remained in custody since that time. The stipulation did not indicate what criminal charges had been filed against Jesus, and the charges are not otherwise revealed in our record.

JUVENILE COURT'S DECISION

In orders filed on October 22, 2018, the juvenile court terminated Jesus' parental rights to Rihanna, Alexander, and Jose after finding that statutory grounds for termination existed pursuant to § 43-292(7), and that termination of his parental rights was in children's best interests.

Jesus appeals the juvenile court's orders.

ASSIGNMENT OF ERROR

Jesus assigns that the juvenile court erred in terminating his parental rights.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016).

## ANALYSIS

### STATUTORY GROUNDS FOR TERMINATION

Although Jesus does not specifically challenge the statutory grounds for terminating his parental rights, for the sake of completeness on our de novo review, we briefly address the statutory grounds.

In Nebraska statutes, the bases for termination of parental rights are codified in § 43-292. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012).

In its orders terminating Jesus's parental rights to Rihanna, Alexander, and Jose, the juvenile court found that statutory grounds existed pursuant to § 43-292(7) (children out-of-home for 15 or more months of the most recent 22 months).

The children had been in an out-of-home placement continuously since December 22, 2016. At the time the supplemental petitions to terminate Jesus' parental rights were filed on May 8, 2018, the children had been in an out-of-home placement for 16 months. And at the time of the termination hearing on August 23, 2018, they had been in an out-of-home placement for 20 months. Our de novo review of the record clearly and convincingly shows that grounds for termination of Jesus' parental rights under § 43-292(7) were proven by sufficient evidence. The next inquiry is whether termination of Jesus' parental rights is in the children's best interests.

### BEST INTERESTS AND UNFITNESS

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). But that is not all. A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *In re Interest of Nichole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014).

There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id*. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that a parent is unfit. *Id*. The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the children's best interests. *In re Interest of Nichole M., supra*. Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's wellbeing. *Id*. The best interests analysis and the parental fitness analysis are

fact-intensive inquiries. *Id*. And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id*.

The children were removed from their parental home on December 22, 2016, because there were allegations that Jesus sexually abused two half-siblings. According to the May 2017 trauma assessment report, Jose had been "spanked" by Jesus both by hand and by belt. The report also notes inappropriate sexual contact between the mother and one of the children. Sometimes the children slept in the same bed as their parents, and reported that their mother did not wear a shirt to bed (her breasts were exposed), and that sometimes Jesus did not wear anything to bed (his penis was exposed). The report states that "[the children] appear to have been exposed to traumatic events and environments that have caused severe emotional trauma that have negatively impacted them developmentally, emotionally, and socially, and academically. The primary trigger to the severe emotional dysregulation and maladaptive coping behaviors appears to be contact with their birth parents." Visitation with their parents, including Jesus, was "very traumatic for the children" and their behaviors escalated to the point that there was a safety issue for the children and the care providers. Even when in-person supervised visitation stopped and contact occurred via telephone or Skype, the children's behaviors continued to escalate. The children were in a "constant state of trauma" and unable to function at day care, school, or at home. As a result, they moved to therapeutic contact. However, because Jesus was incarcerated on June 2, 2017, he was "not available." Jesus was allowed to write letters to the children, which he did at a rate of one letter per month plus birthdays, but he did not follow the parameters set out for him; as a result, portions of his letters were not read to the children. According to Sandra, the children's reactions to the letters "have been mixed," and "as it progressed, Alexander and Jose refused to look at the letters or talk about them. They have not participated in that part." Sandra agreed that Jesus is a trigger for the trauma that the children have experienced, and that he continued to be a trigger at the time of the termination hearing.

According to Sandra's testimony, even if Jesus was available for therapeutic visitation, she would need to have psychological and risk assessments completed on Jesus prior to any therapeutic intervention; this was "[b]ecause of the allegations at the time of placement and the reports of the children during their treatment." She agreed that contact with Jesus at this time would be detrimental to the children. Jessica also testified that Jesus should not have contact beyond letter writing "until risk assessments can be conducted and until there can be boundaries that are followed through on and it's determined to be safe for the children." Jesus argues that the therapists cannot evaluate the relationship between him and his children when they never observed them together. Although neither Sandra nor Jessica had observed Jesus interact with the children, they were able to base their recommendations on their work with (and observations of) the children. Both Sandra and Jessica testified to the importance of permanency for Rihanna, Alexander, and Jose. Sandra said that it is "critically important to their emotional, psychological, and overall development to have permanency, to have a safe place that has predictability that . . . can provide for all of their needs in a safe manner."

At the time of the termination hearing, the children had been in an out-of-home placement for 20 months. Jesus had not had any contact with the children, aside from writing letters, since May 2017. Although we do not know why he had been incarcerated since June 2017, the fact of the matter was that he remained incarcerated at the time of the termination hearing in August 2018.

Because of his incarceration he had been unavailable for therapeutic contact with his children for more than 1 year, and remained unavailable at the time of the termination hearing. We note that he was awaiting a trial on unspecified criminal charges and trial was scheduled for September 2018; it had apparently previously been continued at Jesus' request. But even if Jesus had been available for therapeutic contact, the testimony was that there were a number of steps that would have to occur before therapeutic contact could occur. Thus, reunification with Jesus, if any, would appear to be a long time coming. And the importance of permanency to the children has already been established. The children, having already been in an out-of-home placement for 20 months at the time of the termination hearing, should not now be made to wait for some unknown amount of time to achieve permanency with Jesus. See, *In re Interest of Zanaya W. et al.*, 291 Neb. 20, 863 N.W.2d 803 (2015) (where parent unable or unwilling to rehabilitate within reasonable time, best interests of child require termination of parental rights); *In re Interest of Walter W.*, 274 Neb. 859, 744 N.W.2d 55 (2008) (children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity).

Jesus also argues that the juvenile court made no finding that he was unfit. While it is true that the juvenile court did not make a specific finding of unfitness, an appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016). Under the circumstances of this case, we find that the State has rebutted the presumption of parental fitness and that there is clear and convincing evidence that it is in the best interests of Rihanna, Alexander, and Jose that Jesus' parental rights be terminated.

## CONCLUSION

For the reasons stated above, we affirm the orders of the juvenile court terminating Jesus' parental rights to Rihanna, Alexander, and Jose.

AFFIRMED.